UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| MICHAEL E. HENDRICKS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 1:18-cv-01714-JMS-DLP |
| WEXFORD OF INDIANA, LLC, et al. | ) | |
| Defendants. | ) | |

**Entry Granting Summary Judgment and Directing Final Judgment**

Plaintiff Michael Hendricks, who at all relevant times was incarcerated at Pendleton Correctional Facility ("PCF"), brought this action pursuant to 42 U.S.C. § 1983 against defendants Nurse Rebecca Davis, Dr. Paul Talbot, and Wexford of Indiana ("Wexford"), alleging that the defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights.

The defendants now move for summary judgment on the merits of Mr. Hendricks's claims. Nurse Rebecca Davis seeks judgment as to allegations regarding her treatment of Mr. Hendricks on March 25, 2017, when Corizon, LLC, was the medical service provider for PCF. Dkt. 55. Dr. Paul Talbot and Wexford seek judgment as to allegations regarding Mr. Hendricks's treatment after April 1, 2017, when Wexford had assumed the role as PCF's medical service provider. Dkt. 58.

Mr. Hendricks has not responded to the defendants' motions, and the time to do so has passed, leaving the defendants' motions unopposed. For the reasons explained, the defendants' unopposed motions for summary judgment, dkt. [54] and dkt. [57], are **granted**.

## I. Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the non-moving party, and all reasonable inferences are drawn in the non-movant's favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

## II. Factual Background

As noted above, Mr. Hendricks failed to respond to the defendants' motion for summary judgment. The consequence is that Mr. Hendricks has conceded the defendants' version of the events. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."). The local rule provides:

> A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment.

S.D. Ind. Local Rule 56-1 This does not alter the standard for assessing a Rule 56 motion, but it does "[r]educ[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

Accordingly, the following facts, unopposed by Mr. Hendricks and supported by admissible evidence, are accepted as true. Although the defendants present substantial evidence, the Court sets forth only the facts necessary to resolve Mr. Hendricks's claims given the unopposed nature of the defendants' motion.

On March 25, 2017, Mr. Hendricks was playing basketball at PCF when he jumped for a rebound, landed on another player's foot, and felt a pop when his foot twisted. Dkt. 16 at 3.

Mr. Hendricks was in extreme pain and was sent to the medical unit in a wheelchair because he could not walk. *Id.* at 3-4. Nurse Rebecca Davis treated him that day. She took his vital signs; wrapped his ankle in an elastic bandage; requested a two-day medical lay-in (for meals and medications to be delivered to his cell); and gave him Tylenol, ice compresses, crutches, and the use of a wheelchair. *Id.* at 4-5; dkt. 56-1 at ¶¶ 6-7. Mr. Hendricks requested that she recommend he be moved to a bottom bunk, and she advised him that she did not have the authority to issue a bottom bunk pass. Dkt. 16 at 5. She recommended he return for further evaluation, including for a possible referral for a bottom bunk, in two days. Dkt. 56-1 at ¶ 7. Nurse Davis attested that she provided Mr. Hendricks's name to the nursing and doctor sick call list so that they would put his name on the list for a follow-up visit. *Id.* at ¶ 9.

Mr. Hendricks's name apparently never made it to the sick call list. Dkt. 16 at 5. Mr. Hendricks was not called for a medical appointment on March 26, 2017, so on March 27, 2017, he asked a correctional officer to contact medical about his injury because he had not yet received a medical pass. *Id.* at 5-6. That officer called medical, and they advised him he was not on the call list and would not be seen on March 27, but he would be on the list for March 28. On March 28, he again did not receive a pass, so the officer again contacted medical, who told him to send Mr. Hendricks to medical. *Id.* at 6.

On March 28, 2017, Mr. Hendricks saw a nurse who x-rayed his right foot and provided him with pain medication. *Id.* On March 29, 2017, Dr. Paul Talbot examined Mr. Hendricks for the first time as it related to this injury. Dr. Talbot reviewed the x-ray which revealed swelling but no fracture. Dkt. 59-1 at ¶ 6. He noted tenderness in Mr. Hendricks's ankle, but nothing indicated a torn ligament or serious injury. *Id.* He ordered pain medication for one week, a follow-up in a week, permits for a bottom bunk pass and bottom range pass, a medical lay-in for thirty days,

crutches, and a wheelchair for longer distances, and he placed Mr. Hendricks's ankle in a splint. *Id.*

On April 11, 2017, Mr. Hendricks fell down in the shower and further injured his right ankle. *Id.* at ¶ 7. He went to medical where a nurse noted swelling and tenderness. Dkt. 16 at 7. She contacted Dr. Talbot, who ordered that she provide Mr. Hendricks with an injection of Toradol. Dkt. 59-1 at ¶ 7. The next day, Dr. Talbot examined Mr. Hendricks. He concluded that Mr. Hendricks had a recurrent right ankle sprain, and he counseled Mr. Hendricks to not bear any weight on his foot to provide time for it to heal. *Id.* at ¶ 8. Dr. Talbot ordered that Mr. Hendricks be moved to the medical block for handicap showers for thirty days and crutches for thirty days, for all medication and meals to be delivered for thirty days, and for Mr. Hendricks to return for a follow-up in two to four weeks. *Id.* At his next visit, on April 27, 2017, Dr. Talbot found the swelling had resolved but that Mr. Hendricks was unable to move his ankle due to tenderness and pain, so he ordered that Mr. Hendricks continue no weight-bearing activities and provided Tramadol for pain. *Id.* at ¶ 9. Dr. Talbot also told Mr. Hendricks he would discuss his case with the Regional Medical Director for next steps. *Id.*

Mr. Hendricks received another x-ray on May 18, 2017, that showed no abnormality except mild degenerative changes and resolved effusion. *Id.* at ¶¶ 10-11. At a follow-up visit on May 31, 2017, Dr. Talbot assessed Mr. Hendricks to have chronic degenerative joint disease of the right ankle with a resolved prior sprain. *Id.* at ¶ 11. In consultation with the Regional Medical Director, Dr. Talbot concluded that no further imaging was necessary but ordered that Mr. Hendricks continue with an ankle support and use of a cane, and he further ordered that he receive on-site physical therapy. *Id.*

Dr. Talbot next discussed Mr. Hendricks's ankle issue at a chronic care appointment on July 10, 2017. *Id.* at ¶ 13. Mr. Hendricks still walked with a cane, wore a splint, and reported mild tenderness in his ankle. *Id.* Dr. Talbot noted he should continue with physical therapy. *Id.* He ordered an additional x-ray, which was taken the following day and showed no abnormality. *Id.* at ¶ 14.

Mr. Hendricks attended physical therapy on July 17, 2017, and July 27, 2017, where physical therapist Dana Miller provided him with strengthening exercises. *Id.* at ¶¶ 15-16. Dr. Talbot saw Mr. Hendricks again on August 2, 2017, where Mr. Hendricks requested an air cast and topical pain patch. *Id.* at ¶ 17. Dr. Talbot provided the pain patch and an ankle support, and he noted that Mr. Hendricks had reported improvement with the physical therapy. *Id.* Mr. Hendricks had his third physical therapy appointment with Ms. Miller on August 10, 2017. *Id.* at ¶ 18. She noted some improvement with the therapy but, because arthritic issues were causing pain, she did not recommend further therapy. *Id.*

Dr. Talbot next saw Mr. Hendricks on October 5, 2017. Because Mr. Hendricks was still limping, using a cane, and reporting pain, Dr. Talbot submitted a request for Mr. Hendricks to receive an MRI off-site, as well as an ankle brace and pain medication. *Id.* at ¶ 19.

On November 14, 2017, Mr. Hendricks received an MRI at Eskenazi Hospital in Indianapolis. Dkt. 59-3 at 225-26. His MRI revealed mild bone bruises to the medial malleolus, a tear of the anterior talofibular ligament, as well as two other ligament sprains. *Id.* After reviewing the results of the MRI, Dr. Talbot submitted an off-site patient request for Mr. Hendricks to receive an evaluation from an orthopedic specialist. Dkt. 59-1 at ¶ 21.

On January 5, 2018, Mr. Hendricks received an evaluation from orthopedic specialist Tyler McCarroll. Dkt. 59-3 at 227-29. Dr. McCarroll noted a history of chronic ankle instability

secondary to an injury in March 2017 and noted some swelling and decreased strength in his ankle. *Id*. He recommended that Mr. Hendricks receive a lace-up ankle brace (or the equivalent), physical therapy, pain medication, and a follow-up visit after six weeks. *Id.*

On January 10, 2018, Dr. Talbot had another chronic care visit with Mr. Hendricks where they discussed his ankle. Dkt. 59-1 at ¶ 23. He again reviewed the MRI results and ordered that he was to receive a permit for a cane, bottom bunk and bottom range passes, anti-inflammatory medication (which he refused), and Lidocaine patches. *Id.* Dr. Talbot also informed Mr. Hendricks that he had been approved for further on-site physical therapy and he was to be provided with a laced ankle support. *Id.*

Mr. Hendricks had physical therapy on January 18, 2018, February 1, 2018, and February 13, 2018, with physical therapist Dana Miller. *Id.* at ¶¶ 24-26. At the third appointment, Ms. Miller noted that he was not improving. Dkt. 59-3 at 155.

On February 16, 2018, Mr. Hendricks returned to Eskenazi Hospital for a follow-up orthopedic appointment, and his treatment provider referred him to Dr. Shively for possible surgery given the persistence of the ankle instability. *Id.* at 223-24.

On February 22, 2018, Mr. Hendricks had his seventh and final physical therapy appointment with Ms. Miller. *Id.* at 149. There, they discussed the lack of progress with physical therapy, and Ms. Miller noted he would soon be seeing a specialist about possible surgery. *Id.*

On March 14, 2018, Dr. Talbot saw Mr. Hendricks again regarding his ankle. Dkt. 59-1 at ¶ 29. Dr. Talbot noted that Mr. Hendricks had received an ankle support and Lidocaine patches but was reporting they were not helping. *Id.* Dr. Talbot also noted that Mr. Hendricks had been approved to see an orthopedic specialist at Eskenazi Hospital. *Id.* Dr. Talbot ordered a month's worth of Tramadol for Mr. Hendricks's ongoing pain. *Id.*

On April 2, 2018, Dr. Shively evaluated Mr. Hendricks. Dr. Shively noted that he was seeing Mr. Hendricks for a second opinion after he had previously been evaluated regarding chronic ankle instability secondary to his March 2017 basketball injury. *Id.* at ¶ 30; dkt. 59-3 at 222. Dr. Shively discussed with Mr. Hendricks the potential for a surgical correction, but in his opinion this surgery would "fail due to the natural pull of his foot." Dkt. 59-3 at 222. Dr. Shively did not think surgery was the best option at that time, and he decided to provide a series of casts over several weeks to provide stability to the ankle. *Id.* Mr. Hendricks shortly thereafter received his first cast. He would also return a few weeks later to receive his second cast. *Id.*

On May 9, 2018, Dr. Shively replaced Mr. Hendricks's second cast with a third cast, and he told Mr. Hendricks that he would likely have to be in a lifelong brace to help with the stability of his ankle. *Id.* at 234-35. Mr. Hendricks returned for another cast replacement on May 14, 2018. *Id.* at 231-32. Dr. Shively recommended an EMG nerve conduction study. *Id.* He recommended a future removal of the cast, with Mr. Hendricks to receive a boot until he could be fit for a custom ankle foot orthosis ("AFO"), which might be a long-term or lifetime assistive device. *Id.* Mr. Hendricks thereafter received another cast, which was to be removed by the facility physicians when they were ready to transition him into the boot and the AFO. *Id.*

On May 15, 2018, Dr. Talbot again saw Mr. Hendricks regarding his ankle instability. Dr. Talbot noted Mr. Hendricks had been seen by a separate orthopedic specialist, and that his condition was being managed non-surgically with casts. Dkt. 59-1 at ¶ 33. Dr. Talbot placed a referral for Mr. Hendricks to receive a nerve conduction study and to continue with the recommendations of his outside specialists. *Id.* Dr. Talbot saw Mr. Hendricks again on May 22, 2018, where he provided Tylenol for pain management, recommended he lose weight to decrease pressure on his ankle, and discussed his off-site treatment. *Id.* at ¶ 34. On June 12, 2019, Dr. Talbot

submitted a request for Mr. Hendricks to be sent to a specialized orthotic center for fitting his AFO. *Id.* at ¶ 35.

On June 19, 2018, Mr. Hendricks received an EMG nerve conduction study, which returned normal with no clear evidence of neuropathy. Dkt. 59-3 at 233.

On June 26, 2018, Mr. Hendricks had a chronic care visit with Dr. Talbot where they discussed Dr. Talbot's treatment plan for Mr. Hendricks's ankle. Dkt. 59-1 at ¶ 37. Dr. Talbot noted Mr. Hendricks had been fitted for the AFO and had another off-site follow-up visit approved. *Id.*

On August 13, 2018, Dr. Shively again evaluated Mr. Hendricks. Dkt. 59-3 at 232. Dr. Shively noted that Mr. Hendricks had transitioned to an AFO and walked with a cane, and that he still experienced pain with any weight-bearing activity. *Id.* Dr. Shively noted there was no obvious reason why Mr. Hendricks could not evert his foot—that is, turn the sole of his foot outwards—but he still felt surgery was not warranted. *Id.* He encouraged Mr. Hendricks to continue wearing the AFO and work on strengthening his ankle. *Id.* Mr. Hendricks was only to follow up "PRN," which means "as needed." *Id.*; Dkt. 59-1 at ¶ 38.

Dr. Talbot attested that once he referred Mr. Hendricks to an orthopedic specialist, he deferred ongoing management to the recommendations of the specialists. Dkt. 59-1 at ¶ 41. The specialists' recommendations aligned with Dr. Talbot's, insofar as they focused on non-weight bearing activities, support devices for the ankle, and physical therapy. *Id.* at ¶ 42. None of the specialists recommended surgery. *Id.* Dr. Talbot opined that, given Mr. Hendricks's history of ankle injury and rolling, continued use of the AFO was the best course of treatment. *Id.* at ¶ 43.

At his deposition, taken April 23, 2019, Mr. Hendricks walked with a cane and continued to use his AFO. Dkt. 59-2 at 41-42. Mr. Hendricks stated the AFO helped. *Id.* at 40. Mr. Hendricks

stated he was suing Nurse Davis due to her refusal to call the doctor and issue him a bottom bunk pass. *Id.* at 15. He also disagreed with her decision to wrap his ankle. *Id.* He was suing Dr. Talbot because he believed Dr. Talbot delayed treatment by waiting several months to order an MRI. *Id.* at 16. He thinks the delay in the MRI caused a delay in getting a walking cast and resulted in a lifelong injury. *Id.* at 34-35.

### III.    Discussion

Mr. Hendricks asserts Eighth Amendment medical care claims against the defendants. At all times relevant to Mr. Hendricks's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Deliberate indifference in this context is "something akin to recklessness." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Id. at* 753.

For a medical practitioner, deliberate indifference can be shown by a "treatment decision that is 'so far afield of accepted professional standards' that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

No defendant argues for summary judgment based on the lack of a serious medical need. Accordingly, the Court will consider only whether each defendant was deliberately indifferent to Mr. Hendricks's injury.

**A. Nurse Davis**

The undisputed evidence shows Nurse Davis provided Mr. Hendricks with prompt treatment on March 25, 2017, the day of his injury. She examined his ankle, wrapped it in a bandage to immobilize it, provided instructions on self-care, requested a medical lay-in for two days, and provided Mr. Hendricks with Tylenol, crutches, and a wheelchair. She ordered ice compresses as needed and advised him to return if his symptoms did not improve. Although Mr. Hendricks contends that she wrapped his ankle too tightly in the bandage, there is no evidence that the bandage caused or aggravated his injury. Her treatment decisions were guided by her professional judgment and training, dkt. 56-1 at ¶ 8, and do not reflect deliberate indifference. Further, she cannot be deliberately indifferent for not issuing a bottom bunk pass when she had no authority to do so herself. She noted his request for a bottom bunk and placed him on a two-day lay-in to limit his movement until he could be evaluated at a follow-up visit. Dkt. 56-2 at 3-4.

There is some dispute as to whether Nurse Davis provided Mr. Hendricks's name to the nurse or doctor to be placed on the sick list for a follow-up visit, but this does not prevent a decision on summary judgment. In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Assuming Mr. Hendricks was not on a sick call list for March 26 or 27, he was seen on March 28. Mr. Hendricks testified that in the days before his follow-up visit, he was able to get into the top bunk with the assistance of other offenders. Dkt. 59-2 at 22. Noting Mr. Hendricks had access to ice, Tylenol, crutches, and a wheelchair during that time, there is no evidence that the one or two-day delay before his follow-up appointment exacerbated his injury or unnecessarily prolonged his pain. *Arnett*, 658 F.3d at 753.

No reasonable factfinder could conclude that Nurse Davis was deliberately indifferent to Mr. Hendricks's injury. She is therefore entitled to summary judgment.

**B. Dr. Talbot**

The undisputed evidence shows that Dr. Talbot responded appropriately to Mr. Hendricks's complaints. During his first visit with Mr. Hendricks, he ordered a number of assistive permits and prescriptions, including crutches, a cane, pain medication, and a splint to immobilize his ankle. Dr. Hendricks also recommended a bottom bunk pass and a 30-day lay-in so that Mr. Hendricks would not have to travel any distance. Dr. Talbot did not deny or delay treatment. As Mr. Hendricks's ankle issues persisted, he consulted with the regional director and referred Mr. Hendricks to outside specialists for imaging and treatment. He also referred Mr. Hendricks to

participate in physical therapy. The specialists treated Mr. Hendricks over the course of several months, and their treatment recommendations largely mirrored Dr. Talbot's. Dr. Talbot deferred the ongoing management of Mr. Hendricks's treatment to the recommendations of specialists. Mr. Hendricks received the AFO recommended by the specialist, and none of the specialists recommended surgery. There is no evidence that Dr. Talbot failed to exercise medical judgment or respond appropriately to Mr. Hendricks's complaints.

No reasonable factfinder could conclude that Dr. Talbot was deliberately indifferent to Mr. Hendricks's injury. He is therefore entitled to summary judgment.

### C. Wexford

Because Wexford acts under color of state law by contracting to perform a government function, *i.e.* providing medical care to correctional facilities, Wexford is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). Therefore, to prove a deliberate indifference claim against Wexford, Mr. Hendricks must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Wexford. Mr. Hendricks must show that Wexford has: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-759 (7th Cir. 2004). In addition, the failure to make policy itself may be actionable conduct. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

Mr. Hendricks stated in his deposition that he included Wexford as a defendant because they employed Nurse Davis and Dr. Talbot, and someone told him to include Wexford as a

defendant. Dkt. 59-2 at 17-18. "It is well-established that there is no respondeat superior liability under § 1983." *Jackson* 300 F.3d at 766. A private corporation is not vicariously liable for their employees' alleged deprivations of others' civil rights. *Id.* And, as the Court previously concluded, there is no evidence that Nurse Davis or Dr. Talbot acted with deliberate indifference. It is well established that where there is no evidence of any constitutional violation, any claim based on an unconstitutional policy necessarily fails. *Houskins v. Sheahan*, 549 F.3d 480, 493-94 (7th Cir. 2008) (collecting cases). Finally, there simply is no evidence in the record that Wexford has any policy or practice of denying requests for medical treatment or of condoning deliberate indifference to serious medical needs. Therefore, Wexford is entitled to summary judgment on Mr. Hendricks's policy and practice claim.

### IV. Conclusion

For the reasons explained above, the defendants' unopposed motions for summary judgment, dkt. [54] and dkt. [57], are **granted**. Mr. Hendricks's claims are **dismissed with prejudice**. Final judgment shall issue accordingly.

**IT IS SO ORDERED.**

Date: 12/12/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

MICHAEL E. HENDRICKS
901825
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Mary L. Graham
BLEEKE DILLON CRANDALL ATTORNEYS
mary@bleekedilloncrandall.com